# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **TASHIA TAYLOR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 10-cv-243 TCK FHM** |
| | ) | |
| **RIVERSIDE BEHAVIORAL HEALTH,** | ) | **Judge Terence Kern** |
| **MIKE KISTLER, and** | ) | |
| **MARGARET KOCH,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

## DECLARATION OF JORDAN COOKE

---

STATE OF OKLAHOMA )

COUNTY OF TULSA )

Declarant, Jordan Cooke, under penalty of perjury, states as follows:

1. I am over eighteen years of age, and I make this Declaration based upon my own personal knowledge.

2. I am employed by Riverside Behavioral Health Systems ("Riverside") as Director of Human Resources and I have been in that position for 2 years.

3. Between February 18, 2008 and March 5, 2009, Riverside received twenty-one (21) complaints filed by ten (10) different patients against Tashia Taylor.

4. The allegations of neglect and abuse included complaints that Ms. Taylor: 1) hit and kicked a patient; 2) choked a patient; 3) grabbed patients by the hair and slammed them to the ground; 4) refused to assist an ill patient; 5) confiscated a patient's personal item, including her Bible; and 6) slammed doors on patients' bodies. Seven (7) of the twenty-one (21)

complaints were referred to Oklahoma Department of Human Services Office of Client Advocacy ("OCA") and four (4) were investigated by that agency.

5.      On November 4, 2008, OCA found that Ms. Taylor was guilty of abuse regarding a seventeen-year-old female patient. The investigation concluded that Ms. Taylor urged the patient to hit her head and fists against the wall, called the patient names, and failed to intervene to stop the patient from self-harming. The report also found that Ms. Taylor intentionally degraded and escalated the situation and her actions caused and permitted harm to the health, safety and welfare of the patient.

6.      Mike Kistler, CEO, met with Ms. Taylor following the confirmation of abuse by OCA. Mr. Kistler informed Ms. Taylor that further incidents of misconduct would result in termination of her employment. Mr. Kistler offered to transfer Ms. Taylor to another residential unit with a similar schedule to allow her a fresh start; however, Ms. Taylor did not accept the offer.

7.      Ms. Taylor received seven (7) more complaints of abuse and neglect following the incident that resulted in the OCA's finding that she had abused the teenage patient.

8.      The document attached to this Declaration as "Exhibit A" is a true and correct summary of the allegations of abuse and neglect against Ms. Taylor. The information contained in Exhibit A occurred at or near the time the information was recorded and by those with personal knowledge of the matters recorded in the document. The summary was kept in the course of Riverside's regularly conducted investigation process and was made during that process as a regular practice. The names of the patients have been removed to protect their privacy.

9.    On April 23, 2009, Duane Harris, Director of Human Resources for Shadow Mountain Behavioral Health System, Dr. David Goodgame, Riverside's Clinical Director, and I met with Ms. Taylor to discuss her ongoing pattern of excessive force and untherapeutic interactions with patients. We placed Ms. Taylor on a 90-day probationary period and she received a performance improvement plan. We also asked Dr. Goodgame to provide education and mentoring to Ms. Taylor regarding her difficulties maintaining positive interactions with patients.

10.    On or about May 2, 2009, I received a report that a patient had a knife in the facility. I was informed that Ms. Taylor had been told about the knife the prior day but she failed to report the incident to Riverside administration. A coworker confirmed that Ms. Taylor had been told about the knife by a patient. Dr. Goodgame and I approached Ms. Taylor to request that she be interviewed as a witness regarding the incident. Ms. Taylor turned on a tape recorder and stated that she would not be interviewed unless she was permitted to record the interview or have a witness present. Dr. Goodgame and I informed Ms. Taylor that she could not record the interview or have a witness present because of patient confidentiality and HIPAA concerns. Ms. Taylor refused to participate in the investigation and was suspended. When Ms. Taylor was escorted to the unit to collect her personal belongings, Ms. Taylor began having a conversation on a cellular phone regarding her suspension and the investigation. Ms. Taylor's conversation upset the patients, and several children asked Dr. Goodgame about Ms. Taylor's phone conversation.

11.    The document attached to this Declaration as "Exhibit B" is a true and correct summary of a May 4, 2009 email from Dr. Goodgame regarding Ms. Taylor's refusal to participate in the investigation of the report that a patient had a knife in the facility. The

information contained in Exhibit B occurred at or near the time the information was recorded by Dr. Goodgame and he had personal knowledge of the matters recorded in the email. The email was kept in the course of Riverside's regularly conducted investigation process and was made during that process as a regular practice.

12.     The document attached to this Declaration as "Exhibit C" is a true and correct summary of a May 4, 2009 email from me regarding Ms. Taylor's refusal to participate in the investigation of the report that a patient had a knife in the facility. The information contained in Exhibit C occurred at or near the time I recorded the information and was based on my personal knowledge of the matters recorded in the email. The email was kept in the course of Riverside's regularly conducted investigation process and was made during that process as a regular practice.

13.     On May 6, 2009, Ms. Taylor was terminated for continuing performance issues during her probationary period, including untherapeutic interactions with patients, failure to report an incident to administration regarding a safety concern, and insubordination during the subsequent investigation.

14.     On October 10, 2007, April Burgin received a written warning for spitting on a patient. Ms. Burgin was required to complete retraining in SATORI and was informed that failure to change her behavior would result in further disciplinary action, up to and including termination. Ms. Burgin had no other disciplinary action at the time she was disciplined and she has not received any further disciplinary action since.

15.     Riverside does not have any record of Ms. Taylor making a complaint regarding alleged marijuana or liquor use by Chris Fields. Unsubstantiated allegations that an employee smelled like liquor and marijuana on one occasion is not as serious as numerous complaints of

patient abuse and refusing to participate in an investigation of a patient safety concern while on probation.

16.     On or about April 6, 2009, Ms. Taylor complained that Margaret Koch, Therapist, helped a patient prepare a grievance. Witness statements collected during my investigation did not substantiate Ms. Taylor's complaint. The witness statements indicated that the patient asked Ms. Koch for help completing the grievance because the patient had difficulty reading and writing.

17.     The documents attached to Ms. Taylor's deposition as Exhibit 41 and 42 are true and correct copies of witness interviews collected during the investigation of Ms. Taylor's complaint that Ms. Koch helped a patient write a grievance.   The information contained in Exhibit 41 and 42 occurred at or near the time I recorded the information and was based on the personal knowledge of the individuals interviewed during the investigation. The documents were kept in the course of Riverside's regularly conducted investigation process and were made during that process as a regular practice.

18.     Riverside has no record of the alleged report by Ms. Taylor in January of 2009 regarding an alleged negative statement by Ms. Koch regarding President Obama. After receiving Ms. Taylor's complaint on April 23, 2009, Riverside immediately conducted an investigation regarding the alleged comment. Witness statements collected during the investigation indicated that the alleged statement had been made by a patient and that Ms. Koch had not made any race-related statements during the inauguration. Ms. Taylor's claim that Ms. Koch made the alleged statement could not be confirmed.

19.     The documents attached to Ms. Taylor's deposition as Exhibit 44 are true and correct copies of the investigation summary and witness interviews collected during the

investigation of Ms. Taylor's complaint that Ms. Koch made a negative statement regarding President Obama. The information contained in Exhibit 44 occurred at or near the time I recorded the information and was based on the personal knowledge of the individuals interviewed during the investigation. The documents were kept in the course of Riverside's regularly conducted investigation process and were made during that process as a regular practice.

20.    David Turney and Ms. Koch were not Mr. Taylor's supervisors and did not make any decisions regarding Ms. Taylor's employment.

21.    On February 19, 2009, Riverside received a complaint that David Turney, Nurse, was rude to other staff and cursed in front of a patient. Ms. Taylor was interviewed during the investigation and provided a signed statement. Ms. Taylor's statement does not contain any indication that Mr. Turney made a racial comment. Riverside's investigation concluded that Mr. Turney acted inappropriately by cursing in front of a patient and he was terminated.

22.    The documents attached to this Declaration as "Exhibit D" are true and correct copies of the investigation summary and witness interviews collected during the investigation of inappropriate conduct by Mr. Turney. The information contained in Exhibit D occurred at or near the time I recorded the information and was based on the personal knowledge of the individuals interviewed during the investigation. The documents were kept in the course of Riverside's regularly conducted investigation process and were made during that process as a regular practice.

23.    Ms. Taylor was temporarily transferred to the Trauma Unit during an investigation of abuse filed against her. The temporary transfer to the Trauma Unit did not impact Ms. Taylor's pay or job duties.

24. Riverside did not receive notification that Ms. Taylor had contacted the Equal Employment Opportunity Commission, Oklahoma Department of Labor or Riverside's corporate parent's complaint hotline regarding alleged falsification of recreational therapy records until after Ms. Taylor had been terminated on May 6, 2009.

25. On or about May 21, 2009, Riverside received a letter from the Oklahoma Department of Labor dated May 15, 2009 indicating that Ms. Taylor filed a wage claim. This was the first notice Riverside received that Ms. Taylor had contacted the Oklahoma Department of Labor.

26. The documents attached to this Declaration as "Exhibit E" are true and correct copies of the letter Riverside received from the Oklahoma Department of Labor.

27. On or about June 9, 2009, Riverside received a notice from the EEOC dated May 27, 2009 indicating that Ms. Taylor filed an EEOC charge. This was the first notice Riverside received that Ms. Taylor had contacted the EEOC.

28. On or about April 28, 2009, Riverside was notified by its parent company that an anonymous hotline complaint had been made regarding the falsification of recreational therapy notes. I conducted an investigation and interviewed the employees I thought might have been involved in the situation. There was no indication that Ms. Taylor was involved and she was not interviewed during the investigation. The witnesses interviewed during the investigation stated that they had not been asked to falsify recreational therapy notes, and the hotline complaint could not be confirmed. Riverside has no record of any formal or informal complaints by Ms. Taylor regarding the falsification of recreational therapy notes.

29. The documents attached to this Declaration as "Exhibit F" are true and correct copies of the witness interviews collected during the investigation of the anonymous hotline

complaint regarding the falsification of recreational therapy notes. The information contained in Exhibit F occurred at or near the time I recorded the information and was based on the personal knowledge of the individuals interviewed during the investigation. The documents were kept in the course of Riverside's regularly conducted investigation process and were made during that process as a regular practice.

30. Riverside and Shadow Mountain Behavioral Health System's Abuse & Neglect policy states: "SMBHS administration takes necessary personnel actions to ensure the protection and safety of the alleged victim(s) and other clients." Riverside's Discipline Policy indicates that suspension "may" be utilized but does not mandate that an employee be suspended in every investigation. Suspensions are utilized on a case-by-case basis and are not always imposed during investigations.

31. The documents attached to this Declaration as "Exhibit G" are true and correct copies of the Riverside's Abuse & Neglect Policy and Discipline Policy.

32. All decisions regarding Ms. Taylor's employment were based on legitimate, nondiscriminatory reasons unrelated to her gender, race or alleged complaints.


Signature on following page.

FURTHER DECLARANT SAITH NOT.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 15th day of December, 2010.

_____
Jordan Cooke

4005841.1

# EXHIBIT A

## TASHIA TAYLOR ALLEGATIONS

Below is a comprehensive list of grievances filed by patients regarding MHT Tashia Taylor. Those referred to OCA are noted. Seven grievances have been referred to OCA with four of them being investigated by the patient advocate and three investigated by OCA.

**REDACTED**

| | |
|---|---|
| 02.18.18 | - Hit and kicked during restraint |
| 05.30.08 | - Grievances were thrown away |
| 06.13.08 | - Dropped level for no reason/treating him differently/doesn't like him |
| 07.25.08 | - Pulled her hair during restrain – OCA called |
| 08.13.08 | - Urged her to hit head against wall, degraded and escalated patient, permitted self- harm – abuse confirmed by OCA |
| 08.22.08 | - Refused to allow phone call/would not allow to talk when mom called |
| 09.24.08 | - Removed all personal items, including Bible – OCA called |
| 09.25.08 | - Being a bitch to her |
| 09.25.08 | - Erased level off board and said     did it |
| 10.06.08 | - Shut bathroom door on her – OCA called |

10.07.08    ████████ – Grabbed back of her neck and pushed her down – OCA called

10.08.08    ██████ – Choked him – OCA called

10.14.08    █████████ – Pressuring her to talk about things she didn't feel comfortable discussing

12.06.08    ████████ – Threatened to hit her if she told mom certain things

12.06.08    ████████ – Being disrespectful

12.09.08    ███████ – She was sick and there was no intervention or help

12.10.08    ███████ – Refused to allow phone call

12.30.08    ███████ – Grabbed by hair and slammed her down/no phone call – OCA called

03.05.09    █████ – She pissed him off

03.18.09    ██████ – Shut the door on her and threatened to hit her – OCA called

TAYLOR00003

# EXHIBIT B

**From:** David Goodgame
**Sent:** Monday, May 04, 2009 5:36 PM
**To:** Duane Harris
**Cc:** Mike Kistler; Jordan Cooke
**Subject:** Meeting with Tashia

Duane,
Wanted to update you on our attempt to interview Tashia about what she knew about a patient informing her that a knife had been snuck into South unit last weekend. Jordan called her to meet with her in Jordan's office. Tashia said she wanted to bring her tape recorder and tape the meeting, and Jordan said that we could not meet with her under those conditions. She did not want to say over the phone with Tashia on the unit that she was suspended, or would be suspended, as she was not cooperating with our investigation about what happened that night.

I went to get Tashia to meet with us off the unit. She did follow me to an office adjacent to the reception area, where we met with Jordan. Tashia had her device with her and was pulling it out and started to record when we informed her that if she insisted on recording our meeting that we could not proceed with the investigation and that we would have to suspend her. I asked if she had turned on the recorder and she said yes and we again said that we could not proceed with the recorder on. She protested about having someone there with her, a staff member or someone else, but we said we could not proceed. At that point, we asked for her badge and keys and she delivered them.

She asked to get her things off the unit and I went with her to get them. While getting some things out of the closet on the unit, with all the kids present, she proceeded to make a phone call with a cell phone she had on her person (which is against our policy) and to speak loud enough so that the kids could hear her. I said to her that it was not appropriate, as she said that "They suspended me. . . .!" She ignored my several requests that she not talk in front of the kids. She went on to say that "They said I wasn't cooperating with an investigation!" She got her things continuing to talk on the phone about these things as I escorted her from the unit and then building. Kids were upset by this and asking me then and when I returned to the unit several times about what happened to Ms. Tashia. I could only say that she needed to leave the shift.

David

TAYLOR00004

# EXHIBIT C

**From:** Jordan Cooke
**Sent:** Monday, May 04, 2009 5:07 PM
**To:** Duane Harris
**Cc:** Mike Kistler; David Goodgame
**Subject:** TT
**Importance:** High

I called Tashia Taylor at 4:10 p.m. to ask her to come to my office because I needed to get her statement regarding an investigation that we are conducting. She asked who was being investigated, and I told her no one, that it was regarding an incident that took place last week. She said "that's fine, but I will need to record the conversation." I told her that was not ok, that we could not allow her to record the conversation. She said well then, I guess you won't be getting a statement from me then.

I called Duane Harris to let him know what she said and to ask him how to proceed. He said to get Mike Kistler to go to the unit with me to let her know that if she refused to cooperate with the investigation that we would have to suspend her immediately.

Mike was not in the office, so I let David Goodgame know (as he was the one that was supposed to witness if she did come to my office). He went to the unit to see if he could get her to come speak with us off the unit. She came with him, but refused to leave her recorder behind.

I informed her that we could not allow her to record due to patient confidentiality, as the incident under investigation involved a patient who allegedly brought a knife onto the unit. She said that she would not be interviewed without recording, and that this was another instance of the harassment she continues to be under from us. David and I both let her know that was not acceptable. She said that she could forgo the recording if we allowed her to have another person who was "on her side" present during the interview. I said again, that would be a confidentiality issue and could not be done. She said that she could have another staff member there who was "on her side". I told her that still was not ok and that if she didn't comply that we would have to suspend her and get her keys & badge from her.

David asked her if she was recording and she said yes, and that she had enough for her attorney. She handed her keys and badge over to me.

She then said that she had some personal items that she needed to get from the unit. She and David went to the unit together.

Because she was unable to clock out, I have filled out an Exception Report to clock her out at 4:25p.m.

I received a call at 4:59 p.m. from Tashia asking how long she is being suspended for. I told her I was unsure and would have to check with Duane Harris and call her back with an answer. Duane was not available. I called Mike Kistler to ask him and he said to let her know that we would be meeting about it tomorrow and would call her Tuesday or Wednesday to let her know.

I called her at 5:04 p.m. and told her what Mike said to tell her and she said ok.

Jordan Cooke, LPC

5/5/2009

Director of Human Resources
Riverside Behavioral Health

# EXHIBIT D



SHADOW MOUNTAIN
BEHAVIORAL HEALTH SYSTEM
*A Subsidiary of Psychiatric Solutions, Inc.*

## INVESTIGATION SUMMARY

---

**LOCATION**
**Facility:** Riverside Behavioral Health
**Location:** 1027 E. 66th Place, Tulsa OK 74136

---

### NATURE OF ALLEGATION

**Type of Allegation:** Mistreatment of Staff

**Source of Report:**
- ❑ Patient/Visitor Grievance
- ❑ Staff Grievance
- ☑ Occurrence Report
- ❑ Valuesline Call
- ❑ Other:

**Allegation:** Verbally abusive treatment of staff by RN on duty

**Time & Date of Event Described in Allegation:** 2/19/09, 19:25 and 20:45

---

### EVIDENCE REVIEWED

**List evidence reviewed (medical records, files, reports, grievances, assignment sheets, etc). Note the relevance of all evidence to the investigation.**

- ❑ Patient Medical Records
- ❑ Personnel Records
- ❑ Grievance Report:
- ❑ 15-Minute Check Record
- ❑ Staff Assignment Sheet
- ☑ Witness Statements
- ☑ Incident Reports

---

<u>**WITNESSES:**</u> Daryl Hall, Michelle Adkins, Anton Kemp, Rhonda Adams, Ty Streeter, Tashia Taylor, Jamie Stone, patient Michael

**Date/Time of Interview:** 2/20 through 2/24

**Statement of Witness:** See attached witness statements

A signed statement has been completed by this witness. ☑ Yes ❑ No

---

## RECOMMENDATIONS

**Summary of Findings (Based On Presented Evidence):** Witness statements were taken from the MHT's who were present during the incidents in question. ███████ the child who was present during one of the incidents, was also interviewed. David Turney, RN (the accused) was interviewed as well. The findings are that David, based on witness statements as well as his own account of the events, did act inappropriately and was vebally abusive toward staff and did so in front of our patients.

**Areas Of Concern Noted During Investigation:** Of greatest concern is David's disregard for the patients who were subjected to his inappropriate behavior and comments. Patients were present during the first incident where he was confronting Mr. Jamie and Miss TT. Then, there was a child in the nurses' station when David was ranting at Mr. Daryl, and the child felt very uncomfortable and reported that he was scared of Nurse David.

**Recommended Action:** David has acted in a manner that is unprofessional and displayed unacceptable behaviors in the presence of our patients. The damage to his relationship with the other staff is irreparable and it is therefore recommended that he be terminated.

---

## INVESTIGATION

**Start Date of Investigation:** 2/20/09          **Facility Investigator:** Jordan Cooke, HR Director

THIS DOCUMENT IS CONFIDENTIAL TO THE FACILITY AND PREPARED IN ANTICIPATION OF LITIGATION.
THIS IS NOT PART OF THE MEDICAL RECORD.

Name of Facility: SHADOW MOUNTAIN BEHAVIORAL HEALTH     Contact Person: RISK MANAGER

Please PRINT all of the following information:

DATE OF ADMIT: 01-08-08

DATE OF REPORT: 2/19/09     DATE OF INCIDENT: 2/19/09     TIME OF INCIDENT: 2045

INCIDENT LOCATION: West Common Area     UNIT/PROGRAM: Trauma

CLIENT NAME: Nurse David _____ MR # _____ AGE: ____ ☐ Female ☐ Male

CLIENT NAME: _____ MR # 119451 AGE: 14 ☐ Female ☒ Male

VISITOR/OTHER: _____ ADDRESS: _____

DIAGNOSIS: _____

Name of Attending Physician: _____     Physician notified? ☐ Yes ☐ No

WAS FAMILY/GUARDIAN NOTIFIED? ☐ Yes ☐ No   DATE & TIME: _____

Name: _____     Relationship: _____

LEGAL THREAT     ☐ Yes ☒ No

CLIENT CARE INCIDENT:     INJURY? ☐ Yes ☒ No     ER / URGENT CARE?  ☐ Yes ☒ No

___ 01 BODY EXPOSURE
___ 02 BOUNDARY
___ 03 CONFIDENTIALITY
___ 04 CONSENT
___ 05 CONTRABAND/CONTROLLED ITEM POSSESSION
___ 06 DEATH (OTHER THAN SUICIDE)
___ 07 DEATH (SUICIDE)
___ 08 DISCHARGED AGAINST MEDICAL ADVICE (AMA)
___ 09 ELOPEMENT
___ 10 ELOPEMENT ATTEMPTED
___ 12 FALL
___ 13 HARM TO PEER
___ 14 HARM TO STAFF
___ 15 HIPAA VIOLATION
___ 16 THREAT OF LEGAL ACTION

___ 17 MEDICATION VARIANCE
___ 18 PHYSICAL ABUSE BY STAFF
___ 20 RECREATIONAL INJURY
___ 21 RESTRAINT ___ A) PHYSICAL ___ B) CHEMICAL
                          ___ C) MECHANICAL
___ 22 SECLUSION
___ 23 SELF INFLICTED INJURY
___ 24 SEXUAL FAMILIARITY
    ___ A) PEER/PEER ___ B) STAFF/CLIENT
___ 25 SUICIDE ATTEMPT
___ 26 SUICIDE GESTURE
___ 27 TRANSFER TO ANOTHER FACILITY
___ 28 VERBAL ALTERCATION/THREAT ALLEGED
    ___ A) PEER/PEER ___ B) STAFF/CLIENT
___ 29 MEDICAL COMPLICATION
_X_ 30 OTHER

ENVIRONMENTAL INCIDENT:
___ 31 CONTRABAND/CONTROLLED ITEMS FOUND
___ 32 EQUIPMENT MALFUNCTION
___ 33 IMPROPER NEEDLE DISPOSAL
___ 34 INJURY TO VISITOR
___ 35 MOTOR VEHICLE ACCIDENT/DAMAGE

___ 36 PROPERTY DESTRUCTION
    ___ A) OVER $1500 ___ B) UNDER $500
___ 37 SECURITY
___ 38 SUSPECTED THEFT/LOSS. _____
___ 39 OTHER

HOW WERE YOU INFORMED OF THIS INCIDENT: Self Witness

SUMMARY OF INCIDENT: Nurse David appeared to be upset with MHT Daryl because he stood in the doorway of the nurse station a yelled out at Daryl as he passed through the west common area. Nurse David proceeded to speak in a loud tone to Daryl and then yelled out Daryl was a piece full of shit. I motioned to Daryl to go on to keep things from

SIGNATURE: Michelle A Adkins     PRINT NAME: _____

Title: Michelle Adkins MHC     Date: 2/19/09     Time: _____

FORM # 080106  3RD REVISION 060208

(cont)                          2/19/09 (2045)

elevating any further. Nurse
David at the time had pt
119451 in the nurse station
so I stepped out the unit
to make sure everything was
okay. I did not say anything
to nurse David but when he
saw me pass he ran back to
the doorway and pointed and yell
to me that I was a liar.
pt 119451 returned to unit
stating he was afraid of the
nurse. pt was reassured that
he was safe and everything
was okay. pt was then able
to retire to bed as scheduled.
I then texted David Goodgame
to notify of the incident.

ADDITIONAL INFORMATION, EVALUATION, AND/OR RECOMMENDATIONS (Physician Recommendations as indicated):

_____

_____

_____

_____

_____

_____

TREATMENT INTERVENTIONS:

___ 01 REFERRED TO ER/MEDICAL FACILITY FOR TREATMENT      ___ 04 EXAMINED BY NURSE
___ 02 REFERRED TO ATTENDING PHYSICIAN/FNP FOR EXAM      ___ 05 NO TREATMENT NEEDED
___ 03 FIRST AID ONLY

DID THE INCIDENT RESULT IN A FRACTURE?      ☐ Yes   ☐ No

WAS INCIDENT REPORTED TO OUTSIDE AGENCY?      ☐ Yes   ☐ No    Name: _____
                                            Case #: _____

WERE THERE WITNESSES TO THE EVENT? If so, please state the following:   ☒ Yes   ☐ No
     Name: **Daryl Hall**          Name: **Michael Boyle**

SUPERVISOR SIGNATURE: _____      PRINT NAME: _____

Title: _____      Date: _____      Time: _____

TO BE COMPLETED BY RISK MANAGER:

☐ NOTIFY: _____      ☐ OTHER: _____

FINDINGS OF INVESTIGATION, RECOMMENDATIONS AND OUTCOME :

_____

_____

_____

_____

_____

_____

_____

SEVERITY INDEX:

1) ___ GRAVE                    4) ___ INCONSEQUENTIAL
2) ___ MAJOR
3) ___ MINOR

RISK MANAGER SIGNATURE: _____      PRINT NAME: _____

Phone and Extension: _____      Date: _____

IMMEDIATE NOTIFICATION TO CORPORATE RISK MANAGEMENT DEPARTMENT WHEN UNANTICIPATED DEATH, SIGNIFICANT INJURY, OR ALLEGATION OF SEXUAL ABUSE/NEGLECT INVOLVING STAFF. PLEASE CALL (305) 670-5900 IMMEDIATELY.

THIS INCIDENT REPORT IS CONFIDENTIAL AND SHOULD NOT BE COPIED WITHOUT THE CONSENT OF CORPORATE RISK MANAGEMENT DEPARTMENT VICE PRESIDENT APPROVAL.

FORM # 080104 off new corrections

THIS DOCUMENT IS CONFIDENTIAL TO THE FACILITY AND PREPARED IN ANTICIPATION OF LITIGATION.
THIS IS NOT PART OF THE MEDICAL RECORD.

Name of Facility: SHADOW MOUNTAIN BEHAVIORAL HEALTH        Contact Person: RISK MANAGER

---

Please PRINT all of the following information:                                    DATE OF ADMIT: _____

DATE OF REPORT: 2\19\09      DATE OF INCIDENT: 2\19\09      TIME OF INCIDENT: 1928

INCIDENT LOCATION: Common Area (East)    UNIT/PROGRAM: South

CLIENT NAME: _____  MR # _____  AGE: _____  ☐ Female  ☐ Male

CLIENT NAME: _____  MR # _____  AGE: _____  ☐ Female  ☐ Male

VISITOR/OTHER: Nurse David          ADDRESS: _____

DIAGNOSIS: _____

Name of Attending Physician: _____  Physician notified?  ☐ Yes  ☐ No

WAS FAMILY/GUARDIAN NOTIFIED?    ☐ Yes   ☐ No    DATE & TIME: _____

Name: _____  Relationship: _____

LEGAL THREAT                ☐ Yes   ☐ No

---

CLIENT CARE INCIDENT:      INJURY? ☐ Yes  ☒ No      ER / URGENT CARE?   ☐ Yes  ☒ No

___ 01 BODY EXPOSURE
___ 02 BOUNDARY
___ 03 CONFIDENTIALITY
___ 04 CONSENT
___ 05 CONTRABAND/CONTROLLED ITEM POSSESSION
___ 06 DEATH (OTHER THAN SUICIDE)
___ 07 DEATH (SUICIDE)
___ 08 DISCHARGED AGAINST MEDICAL ADVICE (AMA)
___ 09 ELOPEMENT
___ 10 ELOPEMENT ATTEMPTED
___ 12 FALL
___ 13 HARM TO PEER
___ 14 HARM TO STAFF
___ 15 HIPAA VIOLATION
___ 16 THREAT OF LEGAL ACTION

___ 17 MEDICATION VARIANCE
___ 18 PHYSICAL ABUSE BY STAFF
___ 20 RECREATIONAL INJURY
___ 21 RESTRAINT____A) PHYSICAL____B) CHEMICAL
____ C) MECHANICAL
___ 22 SECLUSION
___ 23 SELF INFLICTED INJURY
___ 24 SEXUAL FAMILIARITY
____A) PEER/PEER___B) STAFF/CLIENT
___ 25 SUICIDE ATTEMPT
___ 26 SUICIDE GESTURE
___ 27 TRANSFER TO ANOTHER FACILITY
___ 28 VERBAL ALTERCATION/THREAT ALLEGED
____A) PEER/PEER___B) STAFF/CLIENT
___ 29 MEDICAL COMPLICATION
☒ 30 OTHER

---

ENVIRONMENTAL INCIDENT:
___ 31 CONTRABAND/CONTROLLED ITEMS FOUND
___ 32 EQUIPMENT MALFUNCTION
___ 33 IMPROPER NEEDLE DISPOSAL
___ 34 INJURY TO VISITOR
___ 35 MOTOR VEHICLE ACCIDENT/DAMAGE

___ 36 PROPERTY DESTRUCTION
____A) OVER $1500___B) UNDER $500
___ 37 SECURITY
___ 38 SUSPECTED THEFT/LOSS. _____
☒ 39 OTHER

HOW WERE YOU INFORMED OF THIS INCIDENT: witness / Self - involved

SUMMARY OF INCIDENT: nurse came over to the unit to give pt
pen but pt refused. Nurse then turned to staff and stated,
"why did you have Dr. Owen order medication if he wasn't going
to take it". Staff informed Nurse that nurse wast called on
the radio twice but nurse never responded and male staff
knocked on the nurse's station door but there was no response.

SIGNATURE: Tassia Taylor          PRINT NAME: Tassia Taylor

Title: MHT          Date: 2\19\09          Time: 2005

FORM # 080106 3ʳᵈ REVISION 060208

➡ continued

nurse stated, "I'm tired of y'all doing that and began to yell at staff in front of the South unit pts. Staff then stated to nurse that he is yelling and that it is inappropriate for him to to have a disagreement in front of the kids. nurse stated, "I don't care about these kids" and proceeded to yell at staff again. Staff again told the nurse that it was inappropriate to discuss the situation right now but if he would come back at a later time that would be more appropriate. Nurse stated, "So! So! What are you going to do, write me up?" Nurse then walked away and stated, "I'm sick of this shit".

Tessica Taylor BS/MHT

ADDITIONAL INFORMATION, EVALUATION, AND/OR RECOMMENDATIONS (Physician Recommendations as Indicated):

_____
_____
_____
_____
_____
_____

TREATMENT INTERVENTIONS:

___ 01 REFERRED TO ER/MEDICAL FACILITY FOR TREATMENT      ___ 04 EXAMINED BY NURSE
___ 02 REFERRED TO ATTENDING PHYSICIAN/FNP FOR EXAM      ___ 05 NO TREATMENT NEEDED
___ 03 FIRST AID ONLY

DID THE INCIDENT RESULT IN A FRACTURE?      ☐ Yes   ☐ No

WAS INCIDENT REPORTED TO OUTSIDE AGENCY?    ☐ Yes   ☐ No    Name: _____
                                                   Case #: _____

WERE THERE WITNESSES TO THE EVENT? If so, please state the following:   ☒ Yes   ☐ No
     Name: Jamie Stone             Name: Rhonda Adams

SUPERVISOR SIGNATURE: _____      PRINT NAME: _____

Title: _____      Date: _____      Time: _____

☐ NOTIFY: _____      ☐ OTHER: _____

FINDINGS OF INVESTIGATION, RECOMMENDATIONS AND OUTCOME :

_____
_____
_____
_____
_____
_____
_____

SEVERITY INDEX:

1) ___ GRAVE                  4) ___ INCONSEQUENTIAL
2) ___ MAJOR
3) ___ MINOR

RISK MANAGER SIGNATURE: _____      PRINT NAME: _____

Phone and Extension: _____      Date: _____

IMMEDIATE NOTIFICATION TO CORPORATE RISK MANAGEMENT DEPARTMENT WHEN UNANTICIPATED DEATH, SIGNIFICANT INJURY, OR ALLEGATION OF SEXUAL ABUSE/NEGLECT INVOLVING STAFF. PLEASE CALL (305) 670-5900 IMMEDIATELY.

THIS INCIDENT REPORT IS CONFIDENTIAL AND SHOULD NOT BE COPIED WITHOUT THE CONSENT OF CORPORATE RISK MANAGEMENT DEPARTMENT VICE PRESIDENT APPROVAL

<u>Daryl Hall:</u>

Daryl said that he came through front entrance of the East Bldg. to work out. Daryl went through the North/South dayroom. Apparently, David was behind him, but Daryl didn't realize it until David started to say to him "you're rude, you're rude". Daryl then started to go through the TRACE/Autism dayroom, and David then began yelling at him through the half-door "you're rude. You know what you did. You're a piece of sh#*. Daryl didn't know there was a kid in the office with David at the time. David kept yelling out at him. Daryl just went out to go to the gym and never did know what he had done to make David think he was rude. Miss Michelle was there during the incident decorating the TRACE unit door.

_____
Employee Signature

2/25/09
_____
Date

<u>Michelle Adkins:</u>

Was working TRACE unit and decorating their door in the dayroom. Heard David open the nurse's station door. Daryl was walking through dayroom and didn't realize that David was talking to him. When Daryl turned around, David said "you're hear teaching these kids to be polite and then you're rude." So Daryl turned around and asked "Did you speak to me and I didn't reply?" David said no, that they were coming and Daryl didn't hold the door open and just let it slam. Daryl said he didn't' realize that he didn't realize he was there. I didn't know I was just walking. David said you know what you are, you're full of sh*#". Michelle told Daryl to just keep going, which he did. Then David went back into the nurse's station and Michelle walked by, and he pointed to her and said "and you, you're a liar"!

There was a child in the nurses' with David when this took place. When child came back to unit, he told Michelle that he was scared of the nurse because David turned to him saying "you can see I'm mad can't you?" Michelle reassured the child that everything was fine, that he could just go to bed.


_Michelle Adkins_
Employee Signature

2/24/09
Date

Anton Kemp:

Anton saw Mr. Daryl walk in and they stopped to talk in dayroom in front of TRACE.
Mr. David started to say something, but Anton didn't hear it because he went back on
the unit. When Anton came back out, he heard Mr. David say to Daryl that "you are full
of sh*#." Mr. Daryl said "ok, if that's the way you feel about me, those are your
feelings", and Daryl walked off. Anton was staying around out in the dayroom because
one of his kids was in the nurses' station. As the kid came out of the nurses' station, he
told Anton, "he scared me because of the way he was talking to Mr. Daryl."

_Clinton Kemp_                          _2/24/09_
Employee Signature                      Date

Rhonda Adams:

On South unit Rhonda was standing at the door. David went in to give kid meds...Jamie said I wouldn't go in there because the kid was throwing things and it wasn't safe. David went in anyway and said the kids' name and the kid cussed at David. David went back out to go to the nurses' station and then he turned around and said to Jamie, you could have come to me instead of going to Dr. Owens, and Jamie said we called you twice. David said I don't think so, my radio is right here. Miss Tashia said we tried, we shouldn't do this in front of the kids. They are listening and this isn't the appropriate time. David said the kids could hear him and he told the techs, "write me up...write me up". David made some comment about passive aggressive. Then Dr. Owens came through, then David went to the nurses' station.

_Rhonda Adams_
Employee Signature

_2-24-09_
Date

<u>Ty Streeter:</u>

David made comment to Ty that someone was rude.  When Ty asked him who it was, and he said there were just rude people around here.

_____
Employee Signature

_____
Date  2/24/09

<u>Tashia Taylor:</u>

Kid on their unit was having an episode and they tried to call nurse David twice over the radio and then Jamie went to nurses' station door to try to find him and no one answered. Jamie called Dr. Owens to order a PRN med or something to try to help de-escalate the kid. David came over later to try to give the PRN med to the kid. Tashia warned David not to go onto unit because the kid was escalated and was throwing chairs and stuff. David said he had to try to give him his meds. He went in and asked kid if he wanted to take the meds and kid refused. David came out of the unit and started talking to Jamie aksing why he would go over his head to Dr. Owens, and the kid wouldn't even take it. Both Jamie and Tashia said they didn't know that he wouldn't take it. He proceeded to yell at both. Tashia said, "Whoa, the kids are here and this is an inappropriate time to discuss this, but if you would like to do so at another time, we would be happy to." David continued to yell with the kids around, "So, I don't care about these kids..." Tashia cut him off again, and told him this is still not appropriate. Now is not the best time to talk about this. David retorted, "So, so what are you going to do, write me up?" He then stormed back toward the nurses' station audibly grumbling, "I'm sick of this sh*#."

Tashia Tassjor
Employee Signature

2/24/09
Date

Jamie Stone:
Jamie tried to radio for nurse David to come give PRN med to a kid that was escalating, but he didn't respond. So Jamie went to Dr. Owens office to get help. David made a statement to Jamie saying about something about him getting the doctor to order meds for a patient. Literally busted him out in front of the kids. Another staff interrupted saying that this wasn't appropriate to have happen in front of the kids. He began to say "write me up, write me up." Then Dr. Owens arrived and so he went back to nurses' station.

David told Daryl he was full of sh*#. Mr. Daryl didn't respond to him. Jamie just acted like he didn't hear it, because he didn't want to get into another altercation.

_____
Employee Signature

_____
Date

2/24/03

## Jordan Cooke

**From:** David Goodgame
**Sent:** Monday, February 23, 2009 10:26 AM
**To:** Mike Kistler; Jordan Cooke
**Subject:** Nurse David

I'm sorry it's taken this long to sit down and write this to you.

I had heard there was a conflict via a text from Ms. Michelle Thursday night. I did not respond to it, but knew it involved Mr. Daryl and herself with the nurse.

I went to talk to Mr. Daryl early Friday morning to ask what had happened, and I think you have that information. But when he indicated that Michael B was in the nurses station, I went to ask Michael about what had happened. I just asked, "Michael, did something happen in the nurses station last night while you were in there?"

He said that Nurse David was upset at Mr. Daryl, but he didn't know why, and when Daryl was walking through the west dayroom, David started yelling at him, "Don't you teach your children to say thank you!" and several other versions of this. He said that Mr. Daryl just laughed and kept walking. At which point, Michael said David yelled that he or what Mr. Daryl was doing was "bullshit." He said that Ms. Michelle popped her head out of the Trace unit, Michael's home unit, and that he, David, started yelling at her that she was a liar and that she covered up for staff when they were abusing kids. When David turned his attention to Michael again, Michael then said that David started asking him if he, Michael, could tell that he was angry. Michael just conveyed to me his discomfort with this, saying he just wanted to get out of there and was frightened by what he saw and heard. He said Ms. Michelle just waited for him to get done and then he returned to his unit.

David

Dvid Turney, RN.

### Incident #1:

Got a call from Dr. Owens saying that Jamie had called her and that Victor needed Zydis. David wrote order and went to give the med to the patient. As he approached the unit, Miss TT told him I wouldn't go in there if I were you, he's dangerous." David said I don't know why you would ask the Dr. for medicine when you know the patient will decline it. I am obligated to offer the med to the patient. Stepped into the unit, and asked the patient if he would take his medicine, which he declined. He stepped out and asked Jamie and TT why they would go to Dr. Owens and they called on the radio 3 times and knocked 2 twice. David said "that isn't correct, and that it was funny the Dr. called and got me right away. It seems to be passive-aggressive behavior and I don't appreciate it." Miss TT said don't be talking this way in front of the patients. David walked back to nurses' station.

### Incident #2:

David says that its a running theme that Daryl is rude toward David in particular.

David was letting a patient's family out the door and Daryl came through and David held the door open for him. David followed Daryl through to the next door that led into the dayroom for North/South unit. Daryl opened the door and let it close in David's face. When David got to the medical unit, he opened up the door because he wanted to ask Daryl, "When you're teaching your children in what's proper when someone opens the door for them, do you teach them to say thank you?" Daryl said yeah. Then David asked "when your children go through a door, do you teach them to hold the door open for the person behind them?" Daryl responded "I didn't realize you were behind me." David said "you're full of sh##." Daryl laughed and walked away. Michelle Adkins was also there and laughed. David then told Michelle that she's a liar because he believes that she's framing her incident reports to cover for the techs.

David Turney
Employee Signature

2-25-09
Date

# EXHIBIT E

# Oklahoma Department of Labor



## Lloyd L. Fields
COMMISSIONER

May 15, 2009

Shadow Mountain Behavioral Health Systems
6262 S Sheridan
Tulsa, OK. 74136

Re:  Wage Claim Number..............200950831BHG - Tashia Taylor
     Amount.................................$2,013.90
     Labor Compliance Officer.....Bob Gann, (918) 581-2864
     E-Mail Address......................bgann@oklaosf.state.ok.us
     Specific Complaint.................Non payment of wages

Pursuant to Oklahoma Statutes, Title 40, Section 165.1 et.seq. and 197.1 et.seq., the referenced claimant has filed a claim alleging your failure to pay the agreed, earned and due wages while in your employment. The issue will be resolved by one of the following methods:

1. If you agree that wages are due, send to the Oklahoma Department of Labor, 440 S. Houston, Suite 300, Tulsa, OK. 74127, the total amount of the wage claim, **payable to the claimant**, or pay the amount you concede to be due, with documentation to substantiate the claim of legal offsets against wages (Section 165.3) and OAC 380:30-30-17(c).

2. Please complete and return the Employer's Wage Claim Response Form, explanation letter and check for the amount of wages **payable to claimant**. If you disagree that wages are due, please return the completed Employer's Wage Claim Response Form, explanation letter and documentation to support disagreement.

Failure to pay earned and due wages shall subject you to civil liabilities and liquidated damages of two (2%) percent of the unpaid wages for each day the earned wage remains unpaid (Section 165.3-B). The two (2%) percent of the gross amount applicable to this claim, if proven to be valid, will be assessed at $40.28 per day. If you fail to complete and return the Employer's Response Form within fifteen (15) days from notice, the Department shall make a determination based upon the information available and documents are the regarding the issuance of the Order of Determination by statute in OAC 380:30-31.

Thank you for your cooperation

Enc (2):  Employee's Wage Claim
          Employer's Wage Claim Response Form

Certified Receipt # 70081830000457647323



# Wage Claim Form
## Oklahoma Department of Labor
ok.gov/odol

Oklahoma City    Tulsa
4001 North Lincoln    440 South Houston, Suite 300
Oklahoma City, OK 73105    Tulsa, OK 74127
405-528-1500    918-581-2400
888-269-5353

This form cannot be accepted by fax or email.

Before completing this form, *read all instructions* printed on the reverse side of this form.

| 1. YOUR NAME | | DATE 3/8/09 |
|---|---|---|
| Tasmira L. Taylor | | |

**2. HOME TELEPHONE** | **CURRENT WORK TELEPHONE** | **CELL #** | **AGE** 26 | **GENDER** F

**3. YOUR ADDRESS** | CITY | STATE | ZIP CODE

**4. CLAIM FILED AGAINST** (Name of Business)
Shadow Mountain Behavioral Health Systems
OWNER/MANAGER Mike Kistler
BUSINESS TELEPHONE 918-492-8300

**5. BUSINESS ADDRESS**
6262 S. Sheridan
CITY Tulsa | STATE OK | ZIP CODE 74133

**6. TYPE OF BUSINESS**
Residential Treatment Center
DESCRIBE WORK PERFORMED: Mental Health Tech

**7. BUSINESS FILED BANKRUPTCY?** Yes ( ) No (X)   IF YES, CASE NUMBER:

**8. ADDRESS WHERE WORK WAS PERFORMED:** Street 1027 E. 61th St. | City Tulsa | County Tulsa

**9. WERE TAXES DEDUCTED FROM YOUR CHECK?** Yes (X) No ( )   DATES OF EMPLOYMENT? (MM/DD/YYYY)   From: 07/05/2007 To: Present

**10. DID YOU RECEIVE A CHECK STUB WITH YOUR PAYCHECK?** Yes (X) No ( )   ARE YOU AN INDEPENDENT CONTRACTOR? Yes ( ) No (X)

**11. BUSINESS STILL OPEN?** Yes (X) No ( )   WERE REGULAR WORKING HOURS SET? Yes (X) No ( )

**12. DID YOU AUTHORIZE DEDUCTIONS OTHER THAN REGULAR PAYROLL TAX, ETC.?** No

**13. WHO HIRED YOU?** Duane Harris/Grey McKellar
WAS AGREEMENT: Oral (X) Written ( )   If written, attach copy to claim form.

**14. DO YOU HAVE ANY OF THE EMPLOYER'S PROPERTY?** Yes ( ) No (X)   HAVE YOU ASKED FOR YOUR WAGES? Yes (X) No ( ).

**15. WERE YOU PAID WITH ANY INSUFFICIENT CHECK(S)?** Yes ( ) No (X)   IF YES, IS AMOUNT INCLUDED IN TOTAL AMOUNT OF CLAIMED? Yes ( ) No (X)

**16. SALARY OR HOURLY RATE OF PAY**
(Examples: $5 per hour, 20% commission)
$9.59 per hour
REGULARLY SCHEDULED PAYDAYS
Weekly ( ) Bi-Weekly (X) Monthly ( )   Bi-Monthly ( ) Other (specify):
Bi-Weekly

**17. ARE YOU RELATED TO YOUR EMPLOYERS?** Yes ( ) No (X)   IF YES, WHAT IS YOUR RELATIONSHIP?

**18. REASON GIVEN BY EMPLOYER FOR NON-PAYMENT OF WAGES:** none they just wanted away
DO YOU OWE MONEY TO THE EMPLOYER? Yes ( ) No (X)

**19. HAVE YOU RETAINED AN ATTORNEY?** Yes ( ) No (X)   IF YES, name, address and telephone of attorney:

**20. HAVE YOU FILED IN CIVIL COURT?** Yes ( ) No (X)   IF YES, case number:

**21. GROSS AMOUNT OF YOUR CLAIM (before taxes):**    (If more than one type of wage is due, fill in each amount AND attach documents.)

a. $_____ Regular
b. $_____ Commission
c. $_____ Minimum Wage
d. $_____ Benefit
e. $ 2013.90 Deduction
f. $_____ Overtime
g. $_____ Miscellaneous

$2013.90 **TOTAL AMOUNT CLAIMED**

**USE THIS SPACE TO EXPLAIN CLAIM INCLUDING DATES:**
Date wages were due (MM/DD/YYYY): 7/11/09 - 3/20/2009

I began to work at the facility in July of 2007 and was informed during orientation that if I did not receive my break I was required to fill out an exception sheet. I did fill a form out

FOR OFFICE USE ONLY
Walk In: Yes ( ) No (X)   FILE DATE: 5-14-09
FILE NO: 200450831   ID: BHG

WCF 2008-10

No.1262   P. 3      May.21. 2009 1:22PM

# Instructions for filing a Wage Claim Form

The Oklahoma Department of Labor (ODOL) serves as an advocate for Oklahoma's workforce. ODOL labor compliance officers investigate the validity of wage claims and, if warranted, will issue orders demanding payment on behalf of employees. For more information about Oklahoma wage laws, access the ODOL website at www.ok.gov/odol, or call ODOL and request your free copy of the Wage Law booklet. Please read and follow the instructions below:

- In order to receive the full benefits due to you under Oklahoma law, you **must have asked** your employer for the wages you believe are due you before completing and filing this form with ODOL.

- This form **must be filled in completely.** Be thorough when explaining your claim including all dates related to your claim.

- This claim form **must be signed and notarized** or it will be returned to you causing a delay in processing your claim. You can take your claim to either the Tulsa or Oklahoma City office of the Oklahoma Department of Labor for notarization but it **will not be accepted through the mail if not notarized.**

- Your employer will be notified via U.S. mail of your complaint within ten (10) working days of the date your claim is received by ODOL. We **must have a valid mailing address for the business you are filing your claim against** in order to process your claim.

- Attach any documents (i.e., time sheets, company policy, pay stubs, etc.) if available to avoid any delays in processing time.

---

USE THIS SPACE FOR FURTHER DETAIL IF NECESSARY, OR ATTACH ADDITIONAL INFORMATION:

each time I worked and did not receive a break. In March 2008 my co-worker, Lead Tech Tyrone Streeter informed me that Program Director Carey McKellar requested that I discontinue filling out exception sheets. I continued to fill them out but never saw the 30 minutes reimbursed to me evident on my paycheck. CEO Mike Kistler was informed in March 2009 that breaks were not being given and our checks do not reflect that and he walked away.

PERSON THROUGH WHOM YOU CAN **ALWAYS** BE REACHED:

| NAME | HOME TELEPHONE | RELATIONSHIP |
|------|----------------|--------------|
|      |                | mother       |

---

I HEREBY CERTIFY, that this is a true statement of wages due to me to the best of my knowledge and belief. *I understand that falsification of any information required by this form is a felony and can result in criminal prosecution.* I understand acceptance of this claim by the Oklahoma Department of Labor does not guarantee collection.

3/8/09
Date          Claimant's Signature

Subscribed and sworn / affirmed before me this _11_ day of _May_, 20_09_

My commission expires: _6 / 11 / 11_          Notary Public

(Seal)

# OKLAHOMA DEPARTMENT OF LABOR
## EMPLOYMENT STANDARD DIVISION
## WAGE & HOUR UNIT



440 South Houston, Suite 300
Tulsa, Oklahoma 74127-8920
(918) 581-2864
Fax (918) 581-2431

## EMPLOYER'S WAGE CLAIM RESPONSE
Before completing your response, **Read All Instructions** printed on the back of this form.

| | | |
|---|---|---|
| **1. CLAIMANT NAME**<br>Tashia Taylor | **EMPLOYER**<br>Shadow Mountain Behavioral Health Systems | **FILE DATE: 5/15/09**<br>200950831BHG |

**2. NAME OF BUSINESS:**      Telephone:

**3. Business Address:**      City      State      Zip

**4. Do You Have Workers Comp?**   Yes ( )   No ( )

Insurance Carrier      Policy #      Effective      Expires

**5. Federal ID No.**      Is the Business Incorporated?   Yes ( )   No ( )      Annual Dollar Volume:

**6. COMPANY PRESIDENT:**      Telephone:

Address      City      State      Zip

**7. COMPANY VICE PRESIDENT:**      Telephone:

Address      City      State      Zip

**8. COMPANY SECRETARY/TREASURER:**      Telephone:

Address      City      State      Zip

**9. SERVICE AGENT:**      Telephone:

Address      City      State      Zip

**10. Is Claimant Related To Owner/Officer of Business?**      If Yes, What Is the Relationship?

**11. Is Business Still Operating?**      Current Number of Employees:

**12. If Business Is Closed Has Any Action Been Filed In Bankruptcy Court?**      Yes ( )   No ( )

Trustee's Name:_____      Case#:_____

Trustee's Complete Address:

**13. List Other Businesses Operated by Corporation or Owner:**

## EMPLOYMENT AGREEMENT

**14. Who Hired Claimant?**      Date of Hire:

**15. Claimant's Starting Employment Date:**      Last Day of Employment:

**16. What Was Agreed pay Period? (Attach Payroll Records)**

17. What Was Agreed Rate of Pay (If more than one type of wage, fill in each amount AND attach supporting documents.)

$_____ REGULAR      USE THIS SPACE TO EXPLAIN

$_____ COMMISSION

$_____ MINIMUM WAGE

$_____ BENEFIT

$_____ DEDUCTION

$_____ OVERTIME

$_____ MISC.

$_____ TOTAL AMOUNT CLAIMED

WHRF-8-01

18. Was Agreement
    Oral ( )          Written, attach copy ( )

Does Claimant Have Any of Your Property? Yes ( )  No ( )
If Yes, explain:

19. Did Claimant Sign Any Documents Authorizing Deductions Other Than Regular Payroll Deductions:
    Yes ( )  No ( )    If yes (enclose copy) and explain:

20. If Claim is For Hourly Wages or Salary, did Claimant Work Weeks/Day/Hours As Claimed?
    Yes ( )  No ( )    (Attach copies of time cards and other records)
    Explain:

21. If Claim is For Holiday, Vacation, Overtime, Severance, Bonuses or Other Similar Advantages of Pay Promised, Do You Have a Policy

or Practice of Making Such Payments?    Yes ( )   No ( )

(Attach copies of any written policies of agreement)
22. Did Claimant Meet Conditions of Such Policies or Practices? Yes ( )   No ( )

Explain:_____

23. Has Claimant Been Paid Any of Wages in Question?          Yes ( )   No ( )

If yes, indicate gross amount paid: _____    (Attach copies to verify payment, i.e. certified checks copied front and back)

Date Paid: _____    Cash ( )    Check ( )    Other, explain ( )_____

24. What Gross Amount Do You Acknowledge is Owed Claimant?

_____    (Attach check in that amount made payable to claimant)

NOTE:    If wages are due, payment must be IMMEDIATE in accordance with Title 40 O.S., Section 165.3B. "If an employer fails
         to pay an employee wages as required under subsection A of this section, such employer shall be additionally liable to the
         employee for liquidated damages in the amount of two percent (2%) of the unpaid wages for EACH DAY upon which such
         failure shall continue after the day upon which payment is required; or in the amount EQUAL to the unpaid wages, whichever
         is smaller,...."

25. State Your Reasons For Not Paying the Amount Alleged by Claimant:

_____

_____

_____

_____

## INSTRUCTIONS FOR FILING
## EMPLOYER WAGE CLAIM RESPONSE

Pursuant to Title 40 O.S. § 197.7 and 165.7, as an employer in the State of Oklahoma, you are required by law to complete an
Employer's Wage Claim Response Form. Your response must also include all documentation (i.e., policies, checks,
payroll, timecards) with regard to your defense of this claim. Your completed response form must be returned to this
department in writing within fifteen (15) days of date on accompanying notice.

I HEREBY VERIFY, that this is a true, complete and accurate statement of facts relating to the claim to the best of my knowledge and
belief. I understand that falsification of any information required by this form is a felony and can result in criminal
prosecution.

_____          _____
        Date                                (Employer's Signature)

                                      _____
                                               (Title)

                                      _____
                                            (Work Address)

                                      _____
                                          (Work City, State, Zip)

                                      _____    _____
                                         (Work Phone)              (Home Phone)

# EXHIBIT F

<u>Interviewed Glenda Bailey 4/28/09 @ 2:32p.m.:</u>  There are times when notes have not been on time.  It's been a while but one night Michelle asked her if she had some that need to get done, and Michelle said that she would help her get them done.  Grey has mentioned to her that she had some that weren't done.  She has never been asked to do a note on a group that didn't actually take place.

_____          _____

Employee Signature                                     Date

<u>Interviewed Nastassia Washington 4/28/09 @ 3:52p.m.:</u> Notes not always done on time. Hasn't been behind enough that someone has told her that she needs to get them done. No one has asked her to document something that didn't actually take place.

_____     _____

Employee Signature                                    Date

<u>Interviewed Ty Streeter 4/28/09 @ 4:05p.m.:</u>  There have been times when his notes on RT haven't been done on time.  There have been occasions where he has been told that he needs to get his notes done.  Krista Roseborough has been the one who has asked him to get them done.  Michelle Adkins recently has reminded him to get them done as well.  No one has ever asked him to falsify notes saying that an activity took place when it really didn't.


_____          _____

Employee Signature                                              Date

<u>Interviewed Tiara Jones 4/28/09 @ 4:20 p.m.:</u> There have been times when she has not gotten her notes for RT done on time. Mr. David and Miss Michelle have come to her and asked her for her notes, but they haven't had prompt her to do them. No one has ever asked her to document something that didn't happen. Occastionally, on a day when there was a good group, that wasn't a scheduled RT activity, Mr. David said that she could put that down as a 4th RT for that day.

_____          _____
Employee Signature                                        Date

<u>Interviewed Chris Fields 4/28/09 @ 4:18p.m.:</u> There have been times that you haven't had his RT notes done on time. He has not had someone come and tell him that he needs to get them done. No one has asked him to falsify a note and document something that hasn't actually taken place.

_____          _____

Employee Signature                                    Date

<u>Interviewed Patricia Emmett 4/28/09 @ 5:07p.m.:</u> Hasn't never had a time when her notes were not done on time. No one has ever asked her to document fraudulently that a session took place when it didn't.

_____          _____

Employee Signature                                          Date

<u>Interviewed Jamie Stone 4/28/09 @ 4:40p.m.:</u>  Never had to document RT groups. Wasn't really trained how to do RT.  Stopped doing RT about 2 weeks ago.  Hasn't had anyone tell him that he needed to get his documentation done.


_____          _____

Employee Signature                              Date

<u>Interviewed Linda King 4/28/09 @ p.m.:</u> Clarified recently that notes being done on time that notes were due on Friday. As they hired on additional UM that Group Notes need to be done on a daily basis. Since that time she's done them daily. Sometimes they are not done right away. Friday is the deadline. She's been tagged by Renee for a missing note, but it was found. No one has asked her to document something that hasn't really happened.


_____          _____
Employee Signature                              Date

<u>Interviewed Margie Koch 4/29/09 @ 8:01a.m.:</u> Has not had an occasion where her notes have not been done on time. She gets a e-mail weekly that her notes are not on the chart, which is for all staff who needs notes on her unit. Renee is the one that sends the e-mail. Krista used to send notices that notes needed to be done. No one has ever asked her to document on something that had not occurred. No one has ever asked her to document anything fraudulently.


_____          _____

Employee Signature                           Date

<u>Interviewed Julie Patrick 5/4/09 @ 9:27 a.m.:</u>  There was a general announcement that notes needed to get done by Friday.  No one has asked her to document fraudulently.


_____          _____

Employee Signature                         Date

<u>Interviewed Haley Cole 4/29/09 @ 12:05 p.m.:</u> There has not been a time where her notes were not done on time. Grey, Mike, David, Krista always encourage her to get her notes done on time. If Krista tells her it's because one is missing from the chart. No one has ever asked her to document on a session that hasn't actually happened.

_____     _____

Employee Signature                                     Date

<u>Interviewed David Goodgame 4/28/09 @ 5:41 p.m.:</u>  Said that there have been times when his charting wasn't completed in the 24-hour turnaround. When that has happened, there have been times when Krista Roseborough has told him that the notes needed to get done. Sometimes, they have been done, but just haven't been printed out and put in the charts. He says that no one has ever asked him to document on something that hasn't really happened.


_____        _____

Employee Signature                            Date

# EXHIBIT G

# SHADOW MOUNTAIN BEHAVIORAL HEALTH SYSTEM
## POLICY AND PROCEDURE

**Title:**                                                                    **Policy # 06-04.0**
  **Employee Discipline**

**Section:**
  **Human Resources Policies & Procedures**

Reviewed:  April 1995, April 2003, January 2004
Revised:    June 2009

Approved:  _____

Approved:  _____

Approved:  _____

---

## PURPOSE

Shadow Mountain Behavioral Health System recognizes its continuing responsibility to develop and administer the facility's policies and disciplinary measures in a manner to benefit and protect all employees, patients and visitors.

## POLICY

The majority of the employees at Shadow Mountain Behavioral Health System do not require corrective action; however, all employees are susceptible to mistakes. Violation of Company rules and policies may result in either a verbal warning, a written warning, suspension or termination. There is no requirement that discipline be progressive or that a warning be given prior to termination.

## GUIDELINES

If corrective action is warranted, the type of discipline will normally be determined on a *case by case* basis by the nature of the circumstances surrounding the problem. Set forth below are some EXAMPLES of misconduct which may result in discipline. This list is not intended to be all inclusive:

- Possession of weapons, firearms or explosives on the premises.
- Threatening, intimidating, coercing or abusing patients, staff, visitors or others.
- Acts of conduct detrimental to patient care or facility operation that result in

neglect or abuse of any patient.
- Failure to use approved behavior crisis management technique in managing patient behavior, use of excessive force, unprofessional or untherapeutic conduct detrimental to patient care.
- Possession, consumption or being under the influence of intoxicants, narcotics or non-prescribed drugs on the premises.
- Breach of staff or patient confidentiality, violation of HIPAA standards.
- Omission or falsification of information on any official company document or verbally to a member of management.
- Failure to report an on-the-job accident.
- Failure to report suspected abuse, neglect, or mistreatment of a patient.
- Failure or refusal to cooperate in an investigation pertaining to alleged employee misconduct, patient care, abuse or neglect.
- Refusal to work, without a good reason, when needed due to emergency call-ins, disaster, patient emergency, etc.
- Failure to observe safety standards and rules.
- Theft of property of patients, the company, co-workers, or visitors.
- Failure to follow instructions.
- Sleeping on the job.
- Altering, adjusting or falsifying a time record, or failure to use time reporting system in prescribed manner.
- Excessive excused or unexcused absenteeism and/or tardiness.
- Job abandonment.
- Horseplay.
- Damage to facility property.
- Insubordination.
- An act of harassment, discrimination, detrimentally impacting morale or functioning of workers, or creating a hostile work environment.
- Leaving duty station without authorization.
- Unexcused absence.
- Interfering with, or purposeful distraction of, another employee in the performance of their work.
- Use of demeaning, vulgar or abusive language.
- Failure to wear prescribed uniforms or apparel.
- Attending to personal affairs on facility time.
- Creating or contributing to unsanitary conditions.
- Gambling on facility premises.
- Multiple complaints, patient grievances, visitor grievances, or other singular or repeated allegations concerning professionalism, performance, allegations of abuse or neglect.
- Eating food prepared and/or intended for patients.
- Work performance not up to established standards.
- Conviction of a felony; or misdemeanor conviction for aggression, assault, drug use or possession, sex crime, animal abuse, or other crime which directly

pertains to the integrity of the function the employee performs, or which detrimentally impacts the reputation or operation of the facility.

## **SUSPENSION**

Suspension without pay may be utilized in disciplinary measures:

- A Disciplinary Suspension may be employed as a serious means of discipline when approved by the facility Administrator.

- An Investigative Suspension, pending investigation for possible termination, is to be employed when the offense may be serious enough to warrant discharge; the employee is not to remain on the facility's premises, but may be allowed to go to Human Resources to provide any information to be included in the investigation. Suspension allows the facility an opportunity to review the case and decide whether or not to discharge the employee. If the decision is made to terminate the employee, employment is terminated without advance notice; however, if circumstances are found to excuse the employee's actions, the employee may be brought back to work; or, if allegations of misconduct are *unfounded*, or if the employee is held blameless, the suspended employee will be brought back to work and paid all wages lost during the suspension.

All cases of suspension must be reviewed and approved by the Administrator, Director of Human Resources, or Administrator on Call. The disposition of a suspension will normally be within three working days and, in any case, shall be brought to a conclusion as soon as the investigation may be completed. In ALL cases of suspension, pending investigation for possible termination, the Administrator or designee will inform the Director of Human Resources, who will facilitate the investigation process.

**Investigation** - When an employee is alleged to have violated a facility rule or act inappropriately, the investigator assigned will be guided by this policy. The Director of Human Resources, or the designated investigator, will initiate and conduct an investigation to determine the accuracy of the charge(s) against the employee. The investigation will include and is not limited to eyewitness accounts, documented records, work samples and employee's view of the incident and/or charges.

The investigator will compile all documents and take accurate notes of the investigation. He/she will review the information with the appropriate chain of command. Documentation citing the disciplinary action will be prepared by the supervisor and approved through the chain of command after a review of the investigation report and the employee's personnel record. The supervisor will

meet with the employee and review the disciplinary action.

**Documentation** - All warnings are documented records prepared by the supervisor and must include:

1. The date, time and circumstance(s) of an offense/infraction committed by the employee.

2. The corrective action to be taken by the employee.

3. What further disciplinary action will be taken if the behavior continues or is not corrected. The warning should be written on a form or in a memorandum or letter format.

**Review** - The supervisor will meet with the employee and review the disciplinary action and ask them to sign the document. Once the employee has signed the document he/she is given a copy of the document with all signatures affixed. If the employee refuses to sign the document, this is to be documented on the form. The original becomes a part of the employee's permanent personnel record which is considered company confidential material.

**Remediation** - If no disciplinary action is required *within 12 months* of any written warning, all disciplinary action forms may be removed from the employee's personnel file. Unless directly related to a future performance problem, these records will not be used as a basis for future disciplinary action. Note: These forms are not destroyed - only removed to a separate file apart from the employee's record.

Related Policies:
02-08.0    Termination of Employment

Related Forms:
Event Record

"Advocate for children
who may not be able to advocate for themselves.
If you witness abuse report it!
It's the law."



# ABUSE & NEGLECT
**RECOGNIZING, REPORTING, & INVESTIGATING CHILD ABUSE**

# ABUSE & NEGLECT

## RECOGNIZING, REPORTING, & INVESTIGATING CHILD ABUSE



OKLAHOMA DEPARTMENT OF HUMAN SERVICES

## OFFICE OF CLIENT ADVOCACY

The Office of Client Advocacy (OCA), a division of Oklahoma Department of Human Services (OKDHS) oversees the care and treatment of children in acute and residential services in the state of Oklahoma, and provides advocacy assistance, conducts investigation and maintains grievance programs to promote client safety and independence and the delivery of OKDHS programs and services in a fair, honest and professional manner.

## DUTY TO REPORT

**Reporting abuse.** To report allegations of caretaker abuse, neglect and exploitation contact the Office of Client Advocacy (OCA) intake. During normal business hours (Monday through Friday 8:00 am – 5:00 pm), call **(405) 525-4850** or send an e-mail to **\*oca.intake@OKDHS.org.**

During after hours, weekend or holiday assistance, contact the Statewide Abuse Hotline at **(800) 522-3511**.

Persons having reason to believe that a minor is a victim of abuse or neglect are required by *Section 7103 of Title 10 of the Oklahoma Statutes* to promptly report it to the Oklahoma Department of Human Services (OKDHS).

Employees of Shadow Mountain Behavioral Health Services who have reason to believe that *caretaker misconduct* has occurred are required to make an *immediate* report via an **Incident Report** to the *Patient Advocate*, who is responsible for *promptly* contacting OCA intake directly. "Promptly" means the same day or the next working day.

**Immunity from liability.** Oklahoma law provides that any person exercising good faith and due care in making a report of alleged abuse, neglect, verbal abuse, or exploitation pursuant to the Oklahoma Child Abuse Reporting and Prevention Act shall have immunity from any civil or criminal liability the person might otherwise incur.

**Questions about reporting.** A person who is uncertain if a particular incident is reportable contacts OCA intake, 1-800-522-8014, during business hours, and after hours call the Abuse Hotline, 1-800-522-3511.

**Failure to report.** Any person who knowingly and willfully fails to promptly report a reportable incident as provided for in this Section may be subject to administrative action or criminal sanctions. *Section 10-104(E) of Title 43A and Section 7103(C) of Title 10 of the Oklahoma Statutes* makes failure to report a **misdemeanor** upon

conviction. *In addition, failure to report by an SMBHS employee may result in disciplinary action including and up to termination of employment.*

**False reporting.** Any person who knowingly and willfully makes a false report regarding alleged maltreatment of a minor, or a report that the person knows lacks factual foundation, may be reported by OKDHS to local law enforcement for criminal investigation and, upon conviction, is guilty of a misdemeanor.

**Method of reporting.** The patient Advocate has been designated by SMBHS to act as liaison with OKDHS, and to assure that all allegations of suspected abuse, neglect, verbal abuse, exploitation of patients, or caretaker misconduct are promptly reported to OCA.

**Confidentiality.** OCA keeps confidential the identity of a person who reports an incident involving a vulnerable adult in accordance with *Section 10-105(2) of Title 43A of the Oklahoma Statutes*, and of a person who reports an incident involving a minor or youth in accordance with *Section 7005-1.2(G)(7) of Title 10 of the Oklahoma Statutes*. OCA accepts anonymous referrals.

**Retaliation prohibited.** *Section 10-104(G) of Title 43A of the Oklahoma Statutes* states that an employer shall not terminate the employment, prevent or impair the practice or occupation of or impose any other sanction on any employee solely for the reason that the employee made or caused to be made a report or cooperated with an investigation.

**Staff training.** All administrators ensure their employees receive relevant training regarding their reporting responsibilities detailed in this Section. Employees receive

this training within 30 calendar days of initial employment and subsequent training annually.

## FACILITY RESPONSIBILITIES

**Immediate protection.** Upon becoming aware of an allegation of caretaker maltreatment involving a patient, SMBHS administration shall act to ensure the safety, protection, and needed medical attention of any client named in the allegation and other clients receiving services from the facility or provider.

When criminal activity is alleged, other than caretaker abuse or neglect unless it involves a serious physical injury, the administrator immediately notifies the appropriate local law enforcement authority.

The types of criminal activity which are reported to law enforcement include, but are not limited to, the use or possession of illegal drugs, domestic abuse, illegal sexual activity, illegal use of alcohol, theft of money, property, or medicine that is a controlled substance, and when someone other than a caretaker is believed to have committed the allegation.

SMBHS administration takes necessary personnel actions to ensure the protection and safety of the alleged victim(s) and other clients. OCA does not determine or approve personnel actions taken by an administrator in response to allegations reported to OCA.

**Preliminary assessment.** Upon learning of an incident reportable to OCA, the administrator:

- immediately *ensures the safety of any client* named in the referral and of other clients;

- secures any <u>physical evidence</u> and gathers documents within the possession of the facility or provider, custody, or control that may be relevant to the allegation;
- immediately takes <u>photographs</u> of any injuries. Photographs are taken by someone who was not involved in the incident that is the subject of the allegation relating to the injuries; and
- <u>coordinates activities</u> with OCA and any other agency or law enforcement authority involved in investigating the referral.

**Collecting pertinent reports and documents.** The administrator determines which employees were present when the alleged incident occurred and requires each employee to submit a written account of the alleged incident. The administrator collects medical records, other documents and reports which pertain to the alleged incident, written statements, and other documentary evidence within the possession of the facility or provider, custody, or control and places them in a holding file for investigative use by OCA and any other investigative authority. The administrator securely maintains any documents collected during the preliminary assessment.

**OCA access to documents and evidence.** Upon request, an OCA investigator is provided a copy of and access to the original of written statements, incident reports, relevant documents and records, and other reports, photos, and other evidence collected during the preliminary assessment.

**Facility and provider contact person.** Each administrator of a facility or provider responsible for the care of any of the individuals listed in *OAC 340:2-3-32(a)(2)* designates a contact person to receive the notice described in subsection (a) of this Section. The contact person at SMBHS is the *Patient Advocate*, **Stacy Bonham**. The administrator informs the advocate general of the name, phone number, and e-mail address of the designated contact person, and immediately notifies the advocate general in writing, by mail or e-mail, of any changes in this information. The designated contact person is reasonably available by telephone, pager, or e-mail between 8:00 a.m. and 5:00 p.m. weekdays, except holidays.

**Ensuring confidentiality.** The Patient Advocate maintains information, files, and documents regarding referrals made to OCA intake, including OCA investigation reports distributed pursuant to *OAC 340:2-3-36*, in a manner that protects the confidentiality of information contained in them.



## INVESTIGATION

**Rights and responsibilities of accused caretakers.** During the investigation process, an accused caretaker has the right to:

- be advised by the Patient Advocate of the nature of the allegation(s) made against him or her in the referral;
- be advised by OCA of the investigative process involving caretaker maltreatment;

- be interviewed by the investigator and allowed to give his or her position regarding the referral;
- be advised by the investigator of the substance of the evidence against him or her, but not the identity of the person reporting the allegation;
- submit or supplement a written statement relating to the allegations;
- seek advice from other parties concerning a caretaker's rights and responsibilities in OCA investigations;
- decline to answer any question when he or she reasonably believes the answer to the question may incriminate him or her in a criminal prosecution; and
- be notified in writing by his or her employer of the outcome of the investigation.

**Responsibilities.** During the investigative process, an accused caretaker has the responsibility to:

- prepare written statements and reports relevant to the investigation upon request;
- be available for interviews and accommodate the investigator in scheduling of interviews;
- refrain from any action that interferes with the investigation, including any action that intimidates, threatens, or harasses any person who has or may provide information relating to the allegation; and
- provide pertinent information and respond fully and truthfully to questions asked.

**Investigative interviews.** The investigator interviews persons known or identified to have information about the referral. If an injury is alleged, the investigator or other appropriate person observes, notes, and documents apparent injuries, and obtains pertinent medical documentation, including photographic evidence. Interviews are conducted in private. No person other than the investigator and the person being interviewed is allowed to attend an interview except a person necessary to facilitate communication. An attorney or other representative of the person being interviewed attends an interview only as a silent observer with prior permission of the advocate general or designee.

**Interview protocols.** The OCA investigator conducts a separate private interview with each alleged victim, available witnesses to the alleged maltreatment, and persons who allegedly were directly or indirectly involved in the allegation, persons with knowledge of relevant information, and each caretaker accused of the maltreatment. *When possible, all other witnesses are interviewed prior to interviewing the accused caretaker(s).*

**Tape recording of interviews.** OCA investigators tape record every interview. To maintain confidentiality of the information provided in an interview, no tape recording by the person being interviewed or by anyone else in attendance is permitted. Tape recordings of interviews remain with the OCA investigative file. *OCA files and tape recordings are not public documents.*

**Explanation of the process.** The investigator informs persons interviewed of the investigative process.

**Presentation of the allegation.** The OCA investigator verbally informs each accused caretaker of the substance of the allegation(s). In general, the investigator discloses only the nature of information learned during the investigation and *does not identify the persons who provided information.* **The identity of the reporter of the allegation is never disclosed during**

**the investigation.** If during the course of an investigation a witness is identified as a potential accused caretaker, the investigator interviews the witness again to inform the witness that he or she is a potential accused caretaker. At that time, the witness is informed of the substance of the evidence and relevant information learned during the investigation and provided an opportunity to respond.

**Opportunity for accused caretakers to respond.** During the interview with an accused caretaker, the OCA investigator provides the caretaker an opportunity to respond to the allegation(s) and to supplement any information previously provided in written statements. Following the initial interview of the accused caretaker, if the investigator obtains information to which the accused caretaker did not have an opportunity to respond, the investigator conducts another interview with the caretaker. The investigator advises the accused caretaker of the substance of the new information and provides an opportunity to present a response.

**Failure to appear.** If a person fails to appear for a scheduled interview without good cause, as determined by the advocate general, the investigator completes the investigative report without interviewing that person. The investigative report includes an explanation of why the interview was not conducted, including documentation of efforts to interview the person.

**Exit notice.** Within 30 calendar days of assignment of a referral to be investigated, the assigned OCA investigator contacts by e-mail the Patient Advocate or facility administrator when the information gathering portion of the investigative process is completed. The investigator informs the administrator of any *areas of concern* identified and that a written report will be prepared with the final finding. Preliminary findings are not required.

**Investigative findings.** The OCA investigator determines the appropriate finding for each allegation contained in the referral investigated. Findings are made based on a greater weight of the evidence standard. The finding options are:

- **"confirmed"** means that the greater weight of the available evidence establishes that the alleged maltreatment occurred;
- **"not confirmed"** means the greater weight of the available evidence indicates that the alleged maltreatment did not occur; or
- **"ruled out"** means no evidence was discovered that indicates the alleged maltreatment occurred.
- **"defer"** means OCA will defer the completion of an investigation and the issuance of a finding upon reasonable request to do so by a law enforcement agency having investigative authority.

**Caretaker Conduct Review.** When OCA receives a referral that indicates possible caretaker misconduct, in lieu of an investigation OCA intake may refer it to the facility where it allegedly occurred for handling as a CCR if:

- o there is no injury or evidence that the client might have been exposed to a significant risk of harm;
- o there is a minor physical injury and it is not a suspicious injury;
- o there is a serious physical injury and the known credible information makes it unlikely that the serious injury was the result of abuse or neglect; or
- o excessive or unauthorized use of force is alleged and there is no injury or only a minor injury that is not suspicious.

**Protocol for conducting a CCR.** When OCA intake assigns a facility the responsibility to conduct a CCR, the Patient Advocate and SMBHS administration take necessary steps to ensure the safety of all patients and to protect the integrity of all evidence. The Patient Advocate follows the investigative procedures including:

- reviewing pertinent documentation, records, and evidence collected;
- viewing any injuries and photos of injuries, and obtaining photos of injuries;
- obtaining written statements and conducting interviews with: each alleged victim; each eyewitness; other persons with knowledge relevant to the allegation; and each accused caretaker;
- reviewing statutes, policies, directives, standards, rules, or practices relevant to the allegation;
- analyzing the accused caretaker's actions in relation to relevant statutes, policies, directives, standards, rules and practices; and
- determining the appropriate finding(s) in accordance with *OAC 340:2-3-36(l)*.

**Time for completion of report.** The final written report is submitted to the advocate general within 30 calendar days from the date that OCA intake notified the administrator that an allegation is referred for CCR.





---

### RECOGNIZING SIGNS OF CHILD ABUSE

---

The following signs may signal the presence of child abuse or neglect.

**The Child:**

- Shows sudden changes in behavior or school performance
- Has not received help for physical or medical problems brought to the parents' attention
- Has learning problems (or difficulty concentrating) that cannot be attributed to specific physical or psychological causes
- Is always watchful, as though preparing for something bad to happen
- Lacks adult supervision
- Is overly compliant, passive, or withdrawn
- Comes to school or other activities early, stays late, and does not want to go home

**The Parent or Other Adult Caretaker:**

- Shows little concern for the child
- Denies the existence of—or blames the child for—the child's problems in school or at home
- Asks teachers or other caregivers to use harsh physical discipline if the child misbehaves
- Sees the child as entirely bad, worthless, or burdensome

- Demands a level of physical or academic performance the child cannot achieve
- Looks primarily to the child for care, attention, and satisfaction of emotional needs

**The Parent and Child:**

- Rarely touch or look at each other
- Consider their relationship entirely negative
- State that they do not like each other

**Types of Abuse.** The following are some signs often associated with particular types of child abuse and neglect: physical abuse, neglect, sexual abuse, and emotional abuse. It is important to note, however, that these types of abuse are more typically found in combination than alone. A physically abused child, for example, is often emotionally abused as well, and a sexually abused child also may be neglected.

### Signs of Physical Abuse

Consider the possibility of physical abuse when the **child**:

- Has unexplained burns, bites, bruises, broken bones, or black eyes
- Has fading bruises or other marks noticeable after an absence from school
- Seems frightened of the parents and protests or cries when it is time to go home
- Shrinks at the approach of adults
- Reports injury by a parent or another adult caregiver

Consider the possibility of physical abuse when the **parent or other adult caregiver**:

- Offers conflicting, unconvincing, or no explanation for the child's injury

- Describes the child as "evil," or in some other very negative way
- Uses harsh physical discipline with the child
- Has a history of abuse as a child



### Signs of Neglect

Consider the possibility of neglect when the **child**:

- Is frequently absent from school
- Begs or steals food or money
- Lacks needed medical or dental care, immunizations, or glasses
- Is consistently dirty and has severe body odor
- Lacks sufficient clothing for the weather
- Abuses alcohol or other drugs
- States that there is no one at home to provide care

Consider the possibility of neglect when the **parent or other adult caregiver**:

- Appears to be indifferent to the child
- Seems apathetic or depressed
- Behaves irrationally or in a bizarre manner
- Is abusing alcohol or other drugs

## Signs of Sexual Abuse

Consider the possibility of sexual abuse when the **child**:

- Has difficulty walking or sitting
- Suddenly refuses to change for gym or to participate in physical activities
- Reports nightmares or bedwetting
- Experiences a sudden change in appetite
- Demonstrates bizarre, sophisticated, or unusual sexual knowledge or behavior
- Becomes pregnant or contracts a venereal disease, particularly if under age 14
- Runs away
- Reports sexual abuse by a parent or another adult caregiver

Consider the possibility of sexual abuse when the **parent or other adult caregiver**:

- Is unduly protective of the child or severely limits the child's contact with other children, especially of the opposite sex
- Is secretive and isolated
- Is jealous or controlling with family members

## Signs of Emotional Maltreatment

Consider the possibility of emotional maltreatment when the **child**:

- Shows extremes in behavior, such as overly compliant or demanding behavior, extreme passivity, or aggression
- Is either inappropriately adult (parenting other children, for example) or inappropriately infantile (frequently rocking or head-banging, for example)
- Is delayed in physical or emotional development

- Has attempted suicide
- Reports a lack of attachment to the parent

Consider the possibility of emotional maltreatment when the **parent or other adult caregiver**:

- Constantly blames, belittles, or berates the child
- Is unconcerned about the child and refuses to consider offers of help for the child's problems
- Overtly rejects the child

## STATISTICS

In 1999, an estimated 3,244,000 children were reported to Child Protective Services (CPS) agencies as alleged victims of child maltreatment. Child abuse reports have maintained a steady growth for the past ten years, with the total number of reports nationwide increasing 45% since 1987. Since 1985, the rate of child abuse fatalities has increased by 39%. Based on these numbers, more than three children die each day as a result of child abuse or neglect (NCPCA's 1996 Annual Fifty State Survey).

With the exception of homicide, children and youths suffer more victimization than do adults in virtually every category, including physical abuse, sibling assault, bullying, sexual abuse, and rape (American Psychological Association Commission on Violence and Youth, 1993). It is estimated that children with disabilities are 4 to 10 times more vulnerable to abuse than their non-disabled peers (National Resource Center on Child Sexual Abuse, 1992).

Advocate for children who may not be able to advocate for themselves. If you witness abuse report it! **It's the law.**

# ABUSE & NEGLECT
## RECOGNIZING, REPORTING, & INVESTIGATING CHILD ABUSE

## WRITTEN EXAM

**NAME:**                                                    **DATE:**

T   F    1. Since 1985, the rate of child abuse fatalities has decreased by 61%.

T   F    2. It is estimated that children with disabilities are 4 to 10 times more vulnerable to abuse than their non-disabled peers.

T   F    3. A child who seems frightened of the parents and protests or cries when it is time to go home is exhibiting a symptom that should be considered a sign of potential physical abuse.

T   F    4. A child who demonstrates bizarre, sophisticated, or unusual sexual knowledge or behavior is exhibiting a symptom that should be considered a sign of potential sexual abuse.

T   F    5. A child who is frequently absent from school, or is consistently dirty and has severe body odor, is exhibiting symptoms that should be considered a sign of potential neglect.

T   F    6. A parent who constantly blames, belittles, or berates a child, or is unconcerned about the child and refuses to consider offers of help for the child's problems, is exhibiting symptoms that should be considered a sign of potential emotional maltreatment.

T   F    7. A finding of *"not confirmed"* by an investigator in an OCA investigation means no evidence was discovered that indicates the alleged maltreatment occurred.

T   F    8. OCA files and tape recordings are public documents.

T   F    9. Any person who knowingly and willfully fails to promptly report a reportable incident of suspected abuse or neglect may be subject to administrative action or criminal sanctions.

T   F   10. Upon becoming aware of an allegation of caretaker misconduct involving a patient, SMBHS administration shall act to ensure the safety, protection, and needed medical attention of any client named in the allegation.

# EMPLOYEE AGREEMENT
# TO REPORT ABUSE & NEGLECT

I have completed the training provided on **"Abuse & Neglect: Recognizing, Reporting, & Investigating Abuse & Neglect"**.  I understand my responsibilities for reporting suspected abuse, neglect, or mistreatment.  I agree to abide by the Shadow Mountain Behavioral Health System policies on reporting abuse, neglect and mistreatment.  I understand that failure to report abuse, neglect, or mistreatment in a timely manner (within 24-hours) is a form of abuse, may result in the termination of my employment with the Shadow Mountain Behavioral Health System, and is a **Class A Misdemeanor** in the State of Oklahoma.  I agree to cooperate fully in any investigation of abuse, neglect, or mistreatment conducted by the *Shadow Mountain Behavioral Health System*, *OKDHS, OJA* and/or the *Office of Client Advocacy.*

_____        _____        _____

**Employee <u>Signature</u>**                  **Legibly <u>Print</u> Your Name**                  **Date**